# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**ARDRA YOUNG,**

              **Plaintiff,**            **CIVIL ACTION NO. 12-CV-12751**

       **vs.**                   **DISTRICT JUDGE ARTHUR J. TARNOW**

                                   **MAGISTRATE JUDGE MONA K. MAJZOUB**

**LATOYA JACKSON, et al.,**

              **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff Ardra Young, currently a prisoner at the Carson City Correctional Facility in Carson City, Michigan, initially filed this action on June 22, 2012, under 42 U.S.C. § 1983 against Defendants LaToya Jackson, Vindha Jayawardena, the Michigan Department of Corrections, and Corizon Health, Inc. (f/k/a/ Prison Healthcare Services, Inc.), alleging that they jointly and severally violated his Eight Amendment right to be free of cruel and unusual punishment when they did not properly treat his knee following a fall. (*See* docket no. 1.) Plaintiff filed an Amended Complaint on September 28, 2012, which updated his Complaint. (*See* docket no. 16.) Defendant MDOC was dismissed from this matter on March 20, 2013. (Docket no. 31.)

Before the Court is a Motion for Summary Judgment (docket no. 52) filed by the remaining Defendants.[1] Plaintiff filed a Response to Defendants' Motion (docket no. 56), and Defendants filed a Reply (docket no. 61). All pretrial matters have been referred to the undersigned for consideration.

---

[1]Also pending before the Court are Plaintiff's Motions to Compel (docket nos. 47 and 59) and Motion for Order (docket no. 62). Because the undersigned recommends granting Defendants' Motion for Summary Judgment, the undersigned will also recommend dismissing these discovery motions as moot. If, however, the Court does not adopt the undersigned's recommendation, the Court will address these discovery motions in a separate opinion and order.

(Docket no. 18.)  The undersigned has reviewed the pleadings, dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), and issues this report and recommendation.

## I.  Recommendation

For the reasons that follow, the undersigned recommends GRANTING Defendants' Motion for Summary Judgment [52].  Thus, the undersigned also recommends DENYING Plaintiff's Motion to Compel [47], Motion to Compel [59], and Motion for Order [62] as moot.  Therefore, the undersigned recommends dismissing this matter in its entirety.

## II.  Report

### A.  Facts

On March 22, 2012, Plaintiff reported to the prison clinic in a wheelchair and told a Defendant LaToya Jackson, a Physicians Assistant that he stepped into a crack on a sidewalk, bent his right knee back, and "heard a pop."  (*See* docket no. 55-1 at 20.)  Plaintiff got out of the wheelchair without assistance, and the Defendant Jackson examined him.  (*Id.*)  She noted that Plaintiff's knee was "asymmetrical" and that Plaintiff was "able to provide range of motion." (*Id.*) She further noted that Plaintiff had "slight swelling" in his knee and that his pain was a seven on a ten-point scale.  (*Id.* at 21.)  She also noted tenderness, palpable distal pulses, and pain with movement.  (*Id.*)  Defendant Jackson gave Plaintiff ice for his knee, ordered him to have lay-in meals, and prescribed crutches and ACE bandages.[2]  (*Id.* at 20, 23.)  She ordered Plaintiff not to sleep in his bandage, to elevate his knee, and to keep ice on the knee for 48 hours.  (*Id.* at 20.)  She also ordered Plaintiff to return for a follow-up visit with his medical provider on March 27, 2012. (*Id.*)

---

[2]As Plaintiff indicates, it appears that he was required to return his ACE bandages and crutches four days later, on March 26, 2012.  (*See* docket no. 58 at 53.)

It is unclear whether Plaintiff saw his provider on March 27, 2012, but it appears that he did not, because on March 28, 2012, he sent another kite requesting to be seen, at which time he was scheduled for a "[follow-up] with the PA;" he ultimately had an appointment with Defendant Jackson on March 30, 2012. (*See id.* at 25-29.) At his appointment, Defendant Jackson first noted that Plaintiff was compliant with the use of his ACE bandages, but he had not been using his crutches. He also continued to complain of a throbbing pain at a six on a ten-point scale, told her that the pain was exacerbated by climbing stairs, and complained of swelling in his knee. (*Id.* at 26.) She noted mild to moderate swelling and mild warmth in his right knee. (*Id.*) She noted no erythema or joint laxity and good range of motion; she noted full range of motion in his left knee. (*Id.*) Defendant Jackson ordered an X-ray of Plaintiff's knee; instructed him to continue using his ACE bandages, to limit weight bearing, and to return to the clinic if his knee got worse; prescribed him Motrin for his pain; and noted that she would reevaluate him in one week. (*Id.* at 27.) Plaintiff's medical record also indicates that she met with Defendant Vindhya Jayawardena, MD, "another provider" at the facility.[3] (*Id.*) She also performed an X-ray on Plaintiff's knee that day. (*Id.* at 28.)

Results of Plaintiff's X-ray were "compromised in the interpretation due to suboptimal x-ray exposure," but Michal A. Henderson D.O., the radiologist who interpreted the results, indicated that "[e]arly arthritic charges are identified on the anterior surface of the patella as represented by small spur formations," and "[n]o fracture or acute osseous abnormalities were seen." (*Id.* at 31.) Defendant Jackson met with Plaintiff on April 5, 2012, and gave Plaintiff the results of his X-ray. Plaintiff told her that he was still in pain and that the pain was not constant, but it occurred

---

[3]Dr. Jayawardena is listed on Plaintiff's medical records has his primary "Provider." (*See, e.g.*, docket no. 55-1.)

throughout the day. Plaintiff also told Defendant Jackson that the pain averaged a six on a ten-point

scale, that his knee was still swollen, and that the Motrin he had been taking was "not very

effective." (*Id.* at 35.) Defendant Jackson noted that Plaintiff's condition was "unchanged from 3-

30-12 visit" and ordered Plaintiff to continue on Motrin and return on May 4, 2012, for a follow-up

appointment. (*Id.* at 36.)

On April 30, 2012, Plaintiff sent a kite requesting a follow-up on his knee problems. (*See

id.* at 37.) The response to his kite request indicates that he was scheduled for an appointment on

May 8, 2012. (*Id.*) This visit appears to have occurred on May 17, 2012, when Plaintiff met with

Defendant Jackson.[4] (*See id.* at 38-39.) Plaintiff informed Defendant Jackson that his knee pain had

not subsided; instead, it was "now constant and worse at night," it alternated between dull and sharp,

and it had increased to an eight on a ten-point scale. (*Id.* at 38.) Plaintiff reiterated that his Motrin

regimen was not effective. (*Id.*) Defendant Jackson noted "[f]ull active and passive [range of

motion]." (*Id.*) She also noted that Plaintiff was dissatisfied with the treatment he was receiving

for his knee pain and that he was "visibly disturbed and walked out [of the] clinic." (*Id.*) She

further noted that Plaintiff was "ambulating with no difficulty," that he was "able to remove his

pants without difficulty," and that he was "not receptive" when he was informed that "there is no

indication for his requested arthrocentesis." (*Id.* at 39.) Defendant Jackson was "unable to address

if [Plaintiff] would like renewal of Motrin" because he "walked out."[5] (*Id.* at 39.)

---

[4]Having had no appointment on May 8, 2012, Plaintiff filed a Step 1 Grievance against
Defendants and a fourth individual raising the same claims that he alleges in this matter.
(Docket no. 58 at 3.) Plaintiff received a response indicating that his Grievance would be
addressed by June 4, 2012. (*Id.* at 7.)

[5]Plaintiff asserts that he could not possibly have "walked out of the clinic" because "[t]he
entry/exit door [to the clinic] can only be opened or closed by custody staff or authorized health
services personnel who possess keys" and that no one granted him egress. (Docket no. 56 at 13.)
Moreover, Plaintiff contends, had he left a secured area without permission, he would have been

On May 25, 2012, Plaintiff fell down a set of stairs.  He told a nurse that his right knee "locked up," which caused him to fall.  (*See id.* at 40.)  He told the nurse that he did not want Motrin or Tylenol because "the meds don't help."  (*Id.*)  Defendant Jackson was informed, and Plaintiff was sent back to his unit.  (*Id.*)

On June 2, 2012, Plaintiff sent another kite requesting an appointment for "knee pain."  He was scheduled for an appointment on or about June 11, 2012.[6]  (*Id.* at 41.)  On June 11, 2012, Plaintiff was seen by a nurse at the prison clinic.  (*Id.* at 42.)  She noted that Plaintiff complained of pain of an eleven on a ten-point scale, that it hurt worse when he was lying down, and that his knee was tender, painful with movement, weak, and swollen, with limited range of motion and palpable distal pulses.  (*Id.*)  Plaintiff complained that he thought there was fluid on his knee.  (*Id.*)  The treatment plan following this appointment is unclear.  (*See id.* at 42-43.)

On June 14, 2012, Plaintiff sent another kite related to his knee pain, and he was scheduled for another appointment on June 21, 2012.  (*See id.* at 44.)  Plaintiff was actually seen by Defendant Jackson on June 18, 2012, who noted that Plaintiff's complaints were consistent with his previous complaints in March, April, and May 2012.  (*Id.* at 46.)  She noted that Plaintiff's right knee had an active range of motion up to 60 degrees and active extension up to 25 degrees with full passive range of motion.  She also noted that Plaintiff was "[a]mbulating with a very slight limp but [with] no difficulty."  (*Id.*)  Defendant Jackson also appears to have discussed the case with Dr. Jayawardena and indicated that she would "generate MRI for the knee as [Plaintiff] continues to [complaint of] knee pain."  (*Id.*)  That day, Defendant Jackson requested an "MRI of [Plaintiff's] right knee to [rule

issued a "major misconduct ticket for being 'out of place.'" (*Id.*)

[6]On June 6th, having received no response to his Step 1 Grievance, Plaintiff requested a Step 2 Grievance Appeal form.  (Docket no. 58 at 7.)

out] meniscal injury." (*Id.* at 49; docket no. 55-2 at 1.)  The request appears to have been approved. (*See* docket no. 55-2 at 2.)  The next day, Plaintiff sent a letter to Frank Konieczki, Administrative Assistant at the Ryan Correctional Facility, requesting assistance in getting a Step 2 Grievance Appeal form and telling Mr. Konieczki about his medical issues.[6]  (Docket no. 58 at 9-10.)  That same day, Plaintiff submitted his Complaint in this matter; it was filed by the Court on June 22, 2012.  (Docket no. 1.)

On June 24, 2012, Plaintiff again submitted a kite regarding his knee pain, and he was scheduled to see a nurse on June 27, 2012.  (*See* docket no. 55-2 at 5.)  Plaintiff saw the nurse on June 27, 2012, and he told her that he "kited because [he] noticed a bump on [his knee]." (*Id.* at 6.) The nurse noted that Plaintiff's objective symptoms were consistent with his previous visits, but she also added that he had "slight edema in right knee and [a] small raised protrusion." (*Id.*)  She applied heat to his knee, immobilized it with a bandage/splint, and told Plaintiff to call if his symptoms did not subside or if they got worse.  (*Id.* at 7.)

Plaintiff had an MRI exam performed on his right knee on or about June 29, 2012.  (*See id.* at 9-10.)  The MRI indicated the following:

1.    an "undersurface tear in the posterior horn of the medial meniscus;"

2.    a "small ruptured popliteal cyst;"

3.    "edema in the soleus and lateral head of the gastrocnemius muscles . . . that is

       probably related to muscle strain;"

---

[6]Plaintiff received a response from Mr. Konieczki indicating that Plaintiff needed to "follow the [appropriate] instructions" to secure his appeal form and to appeal his grievances. (Docket no. 58 at 12.)  Mr. Konieczki also told Plaintiff that "[b]y copy of this memorandum, [Mr. Konieczki was] requesting the Step I Grievance Coordinator to forward a Grievance Appeal to [Plaintiff] regarding [Plaintiff's] health care grievances."  (*Id.*)  On July 3, 2012, Plaintiff sent a follow-up letter to Mr. Konieczki thanking him for his assistance and informing him that Plaintiff still had not received the Appeal Form.  (*Id.* at 14-15.)

4.      a "ganglion cyst associated with the posterior cruciate ligament;"

5.      "quadriceps and petallar tendinosis without full-thickness tear;"

6.      "mild    tricompartment    osteoarthritis,    with    early    medial    compartment

chondromalacia;"

7.      some "old injuries of the anterior cruciate ligament and medial collateral ligament;"

and

8.      "prepatellar and superficial and deep intrapaterral bursitis."

(*Id.* at 9-10.) On July 3, 2012, after receiving the results of this exam, Defendant Jackson requested

that Plaintiff be permitted to follow up with an orthopedics specialist. (*See id.* at 17.) On July 9,

2012, she received a response that the "medical necessity for orthopedic referral [was] not

demonstrated," and that the "MRI does not demonstrate pathology that will be significantly

improved with surgery." (*Id.* at 21.) She was told to determine if Plaintiff's knee was "locking,"

or if he was unable to fully straighten it, and if so, she should resubmit her request. (*Id.* at 21-22.)

Otherwise, Defendant Jackson was told to "continue conservative management including

progressive knee strengthening exercises." (*Id.* at 22.)

On July 10, 2012, Plaintiff met with Defendant Jayawardena because Defendant Jackson was

"on another assignment" that month. (*Id.* at 23.) Defendant Jayawardena discussed the results of

Plaintiff's MRI with him and explained that "joints with multiple pathologies, especially osteopathic

arthritis, do not very well respond to surgical treatment" and that "people less than 40 years of age

would respond to operative treatment." (*Id.* at 24 (punctuation added).) She also added that because

Plaintiff "has not responded to conservative management," which she indicated was "appropriate

therapy for acute knee injury," she would "resubmit the request for ortho[pedic] consultation so that

[an] orthopedic surgeon can review [Plaintiff's] MRI and advise [on] the best nonoperative course

beneficial to [Plaintiff]." (*Id.* at 25.) Defendant Jayawardena resubmitted the consultation request that day. (*See id.* at 26.) On July 12, 2012, she received a response indicating that "most of [Plaintiff's] 'pathologies' . . . do not require any treatment[,] . . . includ[ing the] undersurface tear [of his] medial meniscus, popliteal cyst, soleus and gastrocnemius edema, [and] ganglion cyst." (*Id.* at 30.) The response noted that Plaintiff's bursitis and tendonitis "should be managed with rest and short-term NSAIDs[, and] stretching of [his] quads, hamstrings, [and] calf muscles." (*Id.*) Defendant Jayardena was told that "[o]nce [Plaintiff's] pain is decreased, [he] can be given knee strengthening exercises." (*Id.*)

On July 17, 2012, Plaintiff met with Defendant Jayawardena, who informed him that her request for an orthopedic consult was denied, but she recommended an alternative treatment plan, including physical therapy. (*Id.* at 34.) She asked Plaintiff if he would like her to request approval to attend physical therapy, and he consented. (*Id.*) Defendant Jayawardena requested that Plaintiff be approved for a consultation with a physical therapist, and on July 18, 2012, he was approved for "1 visit only . . . to provide instructions for a home exercise program for knee strengthening." (*Id.* at 38-39.) Plaintiff was told on July 24, 2012, that his request was approved and that he would also be "evaluated for any other suitable equipment[,] like braces," during his appointment. (*Id.* at 40.)

It appears that Plaintiff was transferred from the Ryan Correctional Facility to the Carson City Correctional Facility on or about July 26, 2012. (*See id.* at 42.) Plaintiff was setup for an appointment with his new medical provider on or about August 1, 2012, to discuss his knee pain. (*See id.*) This appointment occurred on August 3, 2012, wherein Plaintiff met a nurse practitioner and recounted the history of his knee problems. (*See id.* at 43.) The NP noted that Plaintiff was setup to go to a physical-therapy appointment and, in the meantime, he was to continue using heat,

stretching, and using Tylenol for pain.  (*Id.* at 44-45.)

Plaintiff had his physical-therapy evaluation on August 6, 2012.  (*See id.* at 49-50.)  The therapist noted that Plaintiff was ambulating without a device but with a compensated gait pattern. (*Id.* at 49.)  She noted that his knee was not "locking," and that although he "stated he was unable to straighten his right knee," "when testing [his] ankle, [she was] able to passively ext[end his] knee."  (*Id.*)  She further noted that Plaintiff asked her to drain fluid from his knee and stated that he wanted meniscus surgery.  She responded by telling Plaintiff that "people without visible effusion do not have their knees drained," and that he did not need surgery because "he does not demo locking out of the knee."  (*Id.* at 49-50.)  The therapist opined that Plaintiff's rehab potential was "good" and that he would be "independent with [a] progressive home exercise program within 1 week."  (*Id.* at 50.)  Plaintiff returned from his appointment, and a prison nurse noted that he was "walking on the toes of his right foot," which Plaintiff indicated was because his knee hurt.  (Docket no. 55-3 at 1.)  The nurse "showed him that [according to his exercise plan] he is to be walking on the heel like he would normally walk."  (*Id.*)

Plaintiff submitted another kite eight days later, on August 14, 2012, related to his knee pain. He was then scheduled for an appointment on August 21, 2012.  (*Id.* at 4.)  Plaintiff had an appointment with another prison nurse on August 16, 2012, at which time she noted that Plaintiff's symptoms remained largely the same as they were in his prior visits.  (*Id.* at 7-8.)  She did note that his knee was warm to the touch and swollen.  (*Id.* at 7.)  Plaintiff was ordered to wrap with ace bandages, ice his knee three times a day, take Tylenol for the pain, and avoid work and sports.  (*Id.* at 8.)

Plaintiff sent another kite on August 26, 2012, at which time he was told that he had a follow-up appointment scheduled for August 30, 2012.  (*Id.* at 12.)  Plaintiff met with a prison

doctor on August 30, 2012, who noted Plaintiff's continuing pain and complaints of his knee "locking up." (*Id.* at 13.)  The doctor noted that he would follow up to see the MRI and X-ray results as well as Plaintiff's physical-therapy evaluation. (*Id.* at 14.)

Plaintiff returned to the clinic on September 10, 2012, and noted that his pain was becoming worse with the cooler weather. (*Id.* at 16.)  He stated that he was "[u]sing Tylenol and heat with no relief" and that his knee had been giving out more since he started his physical-therapy exercises. (*Id.*)  The nurse that examined Plaintiff noted that he had a "4cm faint pink area" on his knee and opined that his knee may be deteriorating because he was wearing the ace bandages every day instead of strengthening his knee. (*Id.* at 17-18.)  Plaintiff was ordered to continue with his current treatment plan. (*Id.* at 18.)  He was asked to return his ace bandages and his crutches (if he still had them) to the clinic. (*Id.* at 20.)

Plaintiff sent another kite related to his knee pain on September 24, 2012, and he was scheduled for an appointment on October 1, 2012. (*Id.* at 25.)  In a clinical note dated September 27, 2012, the prison doctor noted that physical therapy "was authorized[, but] there's still an unhappy knee." (*Id.* at 28.) Plaintiff filed his Amended Complaint on September 28, 2012. (Docket no. 16.)

Plaintiff went to his scheduled appointment on October 1, 2012, where he told the attending PA that his knee still hurt.  The PA noted that his gait was slow and he limped on his right leg. Plaintiff's knee was still tender, warm to the touch, and swollen. (Docket no. 55-3 at 30.)  Plaintiff was told again to "limit activity that causes increased stress or strain to [his] right knee," use Tylenol for his pain, elevate his knee, and follow up at the clinic in one month. (*Id.* at 31.)

Plaintiff returned to the clinic on October 22, 2012, where he told his attending nurse practitioner that he still had knee pain.  She noted that he had stopped his physical-therapy exercises

"about two weeks ago" because they caused pain and that he was still wearing an ACE wrap.  (*Id.* at 35.)  She instructed Plaintiff to "continue to do the exercises taught by physical therapy" and told him that he should stop wearing the ACE wrap because it would "cause muscle weakness and [the] exercises are to increase the strength of the muscles in his knee."  (*Id.*)  She also ordered a new x-ray of his knee, which was conducted that day.  (*See id.* at 37, 38.)  The x-ray indicated that there was "soft tissue swelling" and "early arthritic changes," which was consistent with his x-ray from April 3, 2012.  (*Id.* at 40.)  Plaintiff returned his ACE wrap on November 1, 2012.  (*Id.* at 51.)

On December 19, 2012, Plaintiff had an appointment with an orthopedic specialist, Dr. Thomas Haverbush.[7]  (Docket no. 58 at 17-21.)  Dr. Haverbush performed a complete examination of Plaintiff's knee and reviewed his x-rays and MRI.  (*See id.*)  He opined that Plaintiff required a medial meniscectomy, and requested "approval to schedule [right] knee arthroscopic surgery" because he "d[id] not feel [Plaintiff] c[ould] improve without the procedure."  (*Id.* at 21.)

It appears, however, that Dr. Haverbush's request was not approved, because on May 7, 2013, Plaintiff met with a prison psychologist regarding depression "that he believes . . . is due to chronic pain in his knee."  (*Id.* at 64.)  Plaintiff told the psychologist that he had "trouble sleeping due to the pain."  The psychologist noted that Plaintiff did not want any medications; he just had "no close friends in prison that he fe[lt] comfortable talking to about this."  (*Id.*)  The psychologist further noted that Plaintiff was "pleasant and calm, very respectful."  (*Id.*)  The psychologist then recommended that Plaintiff look into self-hypnosis by getting some books from the library.  (*Id.*)

On June 3, 2013, Plaintiff sent a letter to Defendant Corizon indicating that he was sent to physical therapy in February 2013 and that his condition has "gotten worse" in the "nearly fifteen

---

[7]Plaintiff's medical records after November 1, 2012, are incomplete, but Plaintiff has provided the Court with a copy of his evaluation on December 19.

months" since his injury.  (*Id.* at 44-45.)  Plaintiff further indicated that he had met with a prison

psychologist regarding depression related to his pain, and she told him to go to the library to "read

books about self-hypnosis to alleviate [his] pain."  (*Id.* at 44.)  On June 18, 2013, Plaintiff sent a

letter to the prison librarian requesting help in finding self-hypnotism books.  (*Id.* at 47.)

On September 10, 2013, Plaintiff requested health-care services for an injury that he

sustained when he hit his head falling out of his bunk.  (*Id.* at 49.)  Plaintiff claimed that his right

knee had locked up on him when he tried to climb out of bed.  He further indicated that his knee

condition was "getting <u>worse</u>."  (*Id.* at 49 (emphasis in original).)  Plaintiff was given a "bottom

bunk" assignment on September 26, 2013.  (*Id.* at 50.)

### B.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the

district court – that there is an absence of evidence to support the nonmoving party's case."  *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations, stipulations
> (including those made for purposes of the motion only), admissions, interrogatory
> answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1).  The Rule also provides the consequences of failing to properly support or

address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

## C.    Analysis

### 1.    Plaintiff's Failure to Exhaust Administrative Remedies

Defendants argue that Plaintiff failed to file a Step III (or Step II) grievance in this matter, and therefore, Plaintiff's Complaint should be dismissed.  (Docket no. 52 at 34-35.)  Plaintiff argues that he tried to file his Step II grievance, but he was unable to do so because the prison did not respond to his Step I grievance in a timely manner and would not provide him with a Step II Appeal Form.  (Docket no. 56 at 2-4.)

The Prison Litigation Reform Act (PLRA) of 1995 requires that a prisoner exhaust all administrative remedies before filing a Section 1983 action.  Specifically, the statute provides, "no

action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  But "while the preferred practice is for inmates to complete the grievance process prior to the filing of an action and to attach to their complaint documentation of that fact, 'because the exhaustion requirement is not jurisdictional, district courts have some discretion in determining compliance with the statute.'" *Curry v. Scott*, 249 F.3d 493, 502 (6th Cir. 2001)(citations omitted).

The Sixth Circuit "requires an inmate to make 'affirmative efforts to comply with the administrative procedures,' and analyzes whether those 'efforts to exhaust were sufficient under the circumstances.'" *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (citing *Napier v. Laurel Cnty., Ky.,* 636 F.3d 218, 224 (6th Cir. 2011)(internal quotation marks and citation omitted)).  "It is well established that 'administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance.'"[8] *Id.* (quoting *Boyd v. Corr. Corp. Of Am.*, 380 F.3d 989, 996 (6th Cir. 2004)(citing *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir.2002); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir.2002); *Foulk v. Charrier*, 262 F.3d 687, 698 (8th Cir.2001); and *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir.1999))).  In *Risher*, the Sixth Circuit noted that "'[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.'" *Id.* at 241 (quoting *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)).  Thus, the court held, "[w]hen pro se inmates are required to follow agency procedures to the letter

---

[8]The administrative procedure at issue in *Risher* was the Federal Bureau of Prison's grievance procedure set forth under 28 C.F.R. § 542.18, which "consider[s] the absence of a response to be a denial at that level."  *Risher*, 639 F.3d at 240.  The Michigan Department of Corrections has a similar rule that allows "[a] grievant [to] file a Step II grievance if s/he . . . did not receive a timely response."  MDOC Policy Directive 03.02.130 § BB.

in order to preserve their federal claims, we see no reason to exempt the agency from similar compliance with its own rules." *Id.*

The MDOC Policy Directive regarding prisoner grievances requires a prisoner to file a Step I grievance within five days of attempting to resolve the grievable issue with prison staff. MDOC Policy Directive 03.02.130 § V. At Step II, MDOC policy states, in relevant part, as follows:

> A grievant may file a Step II grievance if s/he is dissatisfied with the response received at Step I or if s/he did not receive a timely response. To file a Step II grievance, *the grievant must request a Prisoner/Parolee Grievance Appeal (CSJ-247B) from the Step I Grievance Coordinator and send the completed form to the Step II Grievance Coordinator* designated for the facility, field office, or other office being grieved within ten business days after receiving the Step I response or, if no response was received, within ten business days after the date the response was due, including any extensions.

*Id.* § BB (emphasis added).

Plaintiff does not dispute that he failed to file a Step II grievance, but he argues that the prison failed to follow its own policy by not giving him a Grievance Appeal form when he requested one. Defendants do not dispute that Plaintiff filed a Step I grievance, that the prison did not respond by the "due date" listed on his Grievance Receipt, or that Plaintiff requested the appropriate Appeal form for filing his Step II grievance. Indeed, Plaintiff's June 6, 2012, request for the appeal form and his June 19, 2012, and July 3, 2012 letters to Mr. Konieczki indicate that Plaintiff attempted to comply with MDOC policy. (*See* docket no 58 at 7. 9-10, 14-15.) Moreover, Mr. Konieczki personally requested (through his letter to Plaintiff) that the Step I Grievance Coordinator forward Plaintiff a Grievance Appeal form. (*Id.* at 12.) Instead, Defendants argue that Plaintiff did file other grievances, which he followed through to Step III, and "[i]t is not the Defendants' or prison official's duty to spoon feed Plaintiff the proper means to file a grievance appeal." (Docket no. 61 at 4.) Defendants do, however, have a duty to follow MDOC policy and provide prisoners with Grievance Appeal forms when so requested. And regardless of whether Plaintiff followed through

with other grievance appeals, his numerous requests made in an effort to obtain the appropriate form in this matter show that he was attempting to comply with MDOC policy where the prison was not. Therefore, the undersigned recommends denying Defendants' Motion with regard to this issue.

### 2. Plaintiff's Deliberate Indifference Claims Against Defendants Jayawardena and Jackson

"The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the 'unnecessary and wanton infliction of pain.'" *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Where a prisoner claims that such a violation occurred through a lack of proper medical care, "it is not necessary that the . . . officials consciously sought to inflict pain by withholding treatment." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988). Instead, "[w]here prison officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Fundamentally, the concept underlying the Eighth Amendment is nothing less than the dignity of humankind." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 564, 568 (6th Cir. 2013) (internal quotations, omissions, and modifications omitted).

To support a claim of deliberate indifference under the Eight Amendment, a Plaintiff must satisfy two components–an objective component, and a subjective component. *Id.* (citing *Harrison v. Ash*, 538 F.3d 510, 518 (6th Cir. 2008)). "Satisfying the objective component ensures that the alleged deprivation is sufficiently severe, while satisfying the subjective component 'ensures that the defendant prison official acted with a sufficiently culpable state of mind.'"[9] *Quigley v. Toung*

---

[9]This undersigned will not address the objective component of the deliberate-indifference inquiry because (1) Defendants do not argue that Plaintiff's injury was not sufficiently serious to

*Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013) (quoting *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003)).

To satisfy the subjective component of a deliberate-indifference claim and show that the defendant had a sufficiently culpable state of mind, a plaintiff must show that "'the official knows of and disregards the substantial risk of serious harm." *Villegas*, 709 F.3d at 569 (quoting *Harrison*, 539 F.3d at 518). The plaintiff need not prove, however, "that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'" *Comstock,* 273 F.3d at 703 (quoting *Farmer,* 511 U.S. at 835). Instead, a plaintiff must show that (1) "the official being sued subjectively perceived facts from which to infer substantial risk to the [plaintiff]," (2) the official "did in fact draw that inference," and (3) the official "then disregarded that risk." *Quigley*, 707 F.3d at 681 (internal quotations omitted). Moreover, "[d]irect evidence about a defendant's knowledge is not necessary, but rather, the knowledge aspect of the subjective component can be determined ["in the usual ways, including inference from circumstantial evidence" *Quigley*, 707 F.3d at 682]." *Villegas*, 709 F.3d at 569. For example, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Quigley*, 707 F.3d at 682; *see also Villegas*, 709 F.3d at 569.

Defendants do not argue that they were unaware of Plaintiff's condition. Instead, Defendants contend that "Dr. Jayawardena examined Plaintiff six times . . . , reviewed x-rays . . . , prescribed pain reliever, requested an MRI, followed up on the MRI results by requesting a consultation for further orthopedic review[,] and explained treatment options for his knee." (Docket no. 52 at 28.) "Similarly, [Defendants assert], [P.A.] Jackson examined the patient's knee, prescribed ice, crutches,

---

satisfy this component and (2) as discussed *infra*, the undersigned finds that Plaintiff's claims do not survive the subjective component of the inquiry.

and ace bandages, scheduled an x-ray of Plaintiff's knee, prescribed pain relievers, and reviewed x-ray and MRI results with the plaintiff." (*Id.* at 28-29.) And although both Defendants "agree with the Utilization Management [(UM)] response that the Plaintiff's knee should be treated conservatively and that surgery is not indicated," they went beyond that conservative opinion and requested, twice, that the UM committee authorize Plaintiff to be evaluated by a specialist. (*Id.* at 29.)

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Hill v. Haviland*, 68 Fed. Appx 603, 604 (6th Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). Thus, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess the medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

Plaintiff first argues that he has established the subjective component of the Court's inquiry "by virtue of the numerous grievances and letters sent via certified mail to each of the Defendants." (Docket no. 56 at 5.) Plaintiff's argument has merit, but only with regard to the knowledge components of the inquiry. If Defendants had asserted that they were unaware of Plaintiff's condition, his reference to these numerous letters would undoubtedly raise a question of fact. But, as noted, Defendants acknowledge that they knew of Plaintiff's condition.

Plaintiff then argues that Defendants' treatment plan was "so cursory [that it] amount[ed] to no treatment at all." (Docket no. 56 at 7-8.) Plaintiff asserts that Defendants' deliberate indifference is, therefore, established "by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." (*Id.* at 8 (quoting *Terrance v. Northville Reg'l*

*Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)(citation omitted)).)

In *Terrance*, a patient who was involuntarily committed to a state-run mental hospital died after being given inadequate care and improper medication. *Terrance*, 286 F.3d at 837-38. With regard to Plaintiff's assertion, the *Terrance* court discussed the type of inadequate care that can constitute deliberate indifference:

> The federal courts have also held that less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases. For example, the Eleventh Circuit has held that "deliberate indifference may be established by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir.1999) (a doctor's awareness that plaintiff's condition was deteriorating and subsequent failure to treat plaintiff could support a finding of deliberate indifference); see *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir.1989) (a doctor's decisions to remove patient from medication and to restore the medication without Lithium constitutes deliberate indifference to patient's psychiatric condition). Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir.1989) (a physician's assistant's failure to inform his superior or a medical doctor of a prisoner's known injured leg constitutes deliberate indifference); *Cooper v. Dyke*, 814 F.2d 941, 945–46 (4th Cir.1987) (a prison employee's two-hour delay in providing medical care to an inmate known to have gunshot wounds constitutes deliberate indifference).

*Id.* at 843-44. Thus, even through a prisoner receives some medical care, if the care was "grossly inadequate," that is, "medical treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness,'" the care may not be adequate enough to avoid a finding of deliberate indifference. *Id.* (citing *Waldrop*, 871 F.2d at 1033 (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986))). The court noted that "the relevant inquiry as to whether the defendants provided grossly inadequate care [is] 'whether a reasonable doctor . . . could have concluded his actions were lawful.'" *Id.* (quoting *Waldrop*, 781 F.2d at 1034).

Here, Defendant Jackson's and Jayawardena's actions do not rise to such a level. While the undersigned is cognizant of Plaintiff's complaints of pain and acknowledges that Plaintiff may have

seen positive results from arthroscopic surgery, the conservative treatment regimen prescribed by Defendants does not shock the conscience.  Moreover, Defendants Jackson and Jayawardena went beyond this conservative treatment plan and requested that Plaintiff be permitted to meet with an orthopedic specialist.  Their inability to have this less-conservative treatment plan authorized does not support Plaintiff's constitutional claims.  To the contrary, Defendants Jackson and Jayawardena appear to have treated Plaintiff's knee pain to the extent of their authorization, even if such treatment was ineffective.  Therefore, the Court should grant summary judgment in favor of Defendants Jackson and Jayawardena.

**2.      Plaintiff's Deliberate Indifference Claims Against Defendant Corizon**

Corporations, whether public or private, cannot be held liable under § 1983 on a respondeat-superior or vicarious-liability basis.  *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996); *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) ("Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act. . . . Liability under this theory must be based upon more than a mere right to control employees and cannot be based upon simple negligence.").  Instead, to establish § 1983 liability, a plaintiff must show that the defendant implemented a policy, custom, or practice that caused a deprivation of the Plaintiff's Eighth Amendment rights.  *Starcher v. Corr. Med. Sys., Inc.*, 7 Fed.Appx. 459, 465 (6th Cir. 2001); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363-64 (6th Cir.1993) (a plaintiff must identify the policy, connect the policy to the defendant and show that the particular injury was caused because of the execution of that policy).  Thus, to support his claim, Plaintiff must show that his Eight Amendment rights were violated and that the violation was caused by Defendant's policy, custom, or practice.  *See Hullett v. Smiedendorf*, 52 F.Supp.2d 817, 828 (W.D. Mich. 1999).

Even assuming Plaintiff could support his claim of a constitutional violation by some

unnamed Corizon employee,[10] Plaintiff is unable to show that the decision to deny surgery was based on some policy, custom, or practice.  Plaintiff asserts that Defendant's decision to deny treatment was "based on financial considerations" (*see* docket no. 56 at 15) but this assertion is, at best, speculation.  Plaintiff argues that he will be able to support his claims through discovery and that "[g]ranting summary judgment is improper where the non-moving plaintiff has had 'an insufficient opportunity for [such] discovery.'"[11] (*Id.* (citing *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231-32 (6th Cir. 1994)).)  But discovery is not a license for a fishing expedition.  Aside from Plaintiff's threadbare assertion, he provides no evidence to suggest that Defendant's decision to provide conservative care was anything more than an (arguably) poor medical decision.  Plaintiff suggests that Defendant's decision to provide arthroscopic surgery to another inmate, *see Caruthers v. Correctional Medical Services, Inc.*, No. 1:10–cv–274, 2011 WL 6402278 (W.D.Mich. Dec.21, 2011), supports his position, but Plaintiff's assertion is counterintuitive.  If anything, Defendant's decision to provide surgery for Caruthers shows that it is *not* concerned about "financial considerations."  Therefore, because Plaintiff cannot provide any evidence to suggest that Defendant Corizon's decision to provide him with conservative care was based on any policy, custom, or practice, the Court should grant summary judgment in favor of Defendant Corizon.

### D.    Conclusion

For the above-stated reasons, the undersigned recommends GRANTING Defendants' Motion for Summary Judgment [52].  Thus, the undersigned also recommends DENYING Plaintiff's Motion

---

[10]While the undersigned find, as discussed *supra*, that the actions of Defendants Jackson and Jayawardena do not rise to the level of a Constitutional violation, this decision was based, in part, on their unsuccessful attempts to secure the opinion of an orthopedic specialist.  This finding does not presuppose that Corizon's refusal to authorize such care was similarly reasonable.

[11]Plaintiff then draws the Court's attention to his outstanding discovery motions.

to Compel [47], Motion to Compel [59], and Motion for Order [62] as moot.  Therefore, the undersigned recommends dismissing this matter in its entirety.

## III.    Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated:  November 13, 2013                            s/ Mona K. Majzoub
                                                    MONA K. MAJZOUB
                                                    UNITED STATES MAGISTRATE JUDGE

## **PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Andrea Young and Counsel of Record on this date.

Dated: November 13, 2013                    s/ Lisa C. Bartlett
                                            Case Manager