**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**ARDRA YOUNG,**

        **Plaintiff,**                           **CIVIL ACTION NO. 12-CV-12751**

   **vs.**                                      **DISTRICT JUDGE ARTHUR J. TARNOW**

                                                    **MAGISTRATE JUDGE MONA K. MAJZOUB**

**LATOYA JACKSON, et al.,**

        **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff Ardra Young, currently a prisoner at the Carson City Correctional Facility in Carson City, Michigan, initially filed this action on June 22, 2012, under 42 U.S.C. § 1983 against Defendants LaToya Jackson, Vindha Jayawardena, the Michigan Department of Corrections, and Corizon Health, Inc. (f/k/a/ Prison Healthcare Services, Inc.), alleging that they jointly and severally violated his Eight Amendment right to be free of cruel and unusual punishment when they did not properly treat his knee following a fall. (*See* docket no. 1.) Plaintiff filed an Amended Complaint on September 28, 2012, which updated his Complaint. (*See* docket no. 16.) Defendant MDOC was dismissed from this matter on March 20, 2013. (Docket no. 31.) Defendants LaToya Jackson and Vindha Jaywardena were dismissed from this matter on March 31, 2014. (Docket no. 73.)

Before the Court is Defendant's Amended Renewed Motion for Summary Judgment (docket no. 81) filed by Defendant Corizon.[1] Plaintiff filed a Motion for Extension of Time to File a

---

[1] Also pending before the Court is Defendant Corizon's Renewed Motion for Summary Judgment. (Docket no. 80.) Because this motion is superseded by Defendant's Amended Renewed Motion for Summary Judgment, the undersigned recommends denying the Renewed Motion for Summary Judgment as moot.

Response. (Docket no. 82.) The Court granted Plaintiff's Motion, requiring that Plaintiff file a Response by September 8, 2014. (Docket no. 84.) Plaintiff failed to file a Response. The undersigned has reviewed the pleadings, dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), and issues this Report and Recommendation.

## I. Recommendation

For the reasons that follow, the undersigned recommends GRANTING Defendant Corizon's Amended Renewed Motion for Summary Judgment [81]. The undersigned also recommends DENYING Defendant Corizon's Renewed Motion for Summary Judgment [80] as moot. Therefore, the undersigned recommends dismissing this matter in its entirety.

## II. Report

### A. Facts

The underlying facts of this case have remained unchanged since they were initially articulated by this Court in the Report and Recommendation issued on November 13, 2013:

> On March 22, 2012, Plaintiff reported to the prison clinic in a wheelchair and told a Defendant LaToya Jackson, a Physicians Assistant, that he stepped into a crack on a sidewalk, bent his right knee back, and "heard a pop." (*See* docket no. 55-1 at 20.) Plaintiff got out of the wheelchair without assistance, and Defendant Jackson examined him. (*Id.*) She noted that Plaintiff's knee was "asymmetrical" and that Plaintiff was "able to provide range of motion." (*Id.*) She further noted that Plaintiff had "slight swelling" in his knee and that his pain was a seven on a ten-point scale. (*Id.* at 21.) She also noted tenderness, palpable distal pulses, and pain with movement. (*Id.*) Defendant Jackson gave Plaintiff ice for his knee, ordered him to have lay-in meals, and prescribed crutches and ACE bandages. (*Id.* at 20, 23.) She ordered Plaintiff not to sleep in his bandage, to elevate his knee, and to keep ice on the knee for 48 hours. (*Id.* at 20.) She also ordered Plaintiff to return for a follow-up visit with his medical provider on March 27, 2012. (*Id.*)
>
> It is unclear whether Plaintiff saw his provider on March 27, 2012, but it appears that he did not, because on March 28, 2012, he sent another kite requesting to be seen, at which time he was scheduled for a "[follow-up] with the PA;" he ultimately had an appointment with Defendant Jackson on March 30, 2012. (*See id.*

at 25-29.) At his appointment, Defendant Jackson first noted that Plaintiff was compliant with the use of his ACE bandages, but he had not been using his crutches. He also continued to complain of a throbbing pain at a six on a ten-point scale, told her that the pain was exacerbated by climbing stairs, and complained of swelling in his knee. (*Id.* at 26.) She noted mild to moderate swelling and mild warmth in his right knee. (*Id.*) She noted no erythema or joint laxity and good range of motion; she noted full range of motion in his left knee. (*Id.*) Defendant Jackson ordered an X-ray of Plaintiff's knee; instructed him to continue using his ACE bandages, to limit weight bearing, and to return to the clinic if his knee got worse; prescribed him Motrin for his pain; and noted that she would reevaluate him in one week. (*Id.* at 27.) Plaintiff's medical record also indicates that she met with Defendant Vindhya Jayawardena, MD, "another provider" at the facility. (*Id.*) She also performed an X-ray on Plaintiff's knee that day. (*Id.* at 28.)

Results of Plaintiff's X-ray were "compromised in the interpretation due to suboptimal x-ray exposure," but Michal A. Henderson D.O., the radiologist who interpreted the results, indicated that "[e]arly arthritic charges are identified on the anterior surface of the patella as represented by small spur formations," and "[n]o fracture or acute osseous abnormalities were seen." (*Id.* at 31.) Defendant Jackson met with Plaintiff on April 5, 2012, and gave Plaintiff the results of his X-ray. Plaintiff told her that he was still in pain and that the pain was not constant, but it occurred throughout the day. Plaintiff also told Defendant Jackson that the pain averaged a six on a ten-point scale, that his knee was still swollen, and that the Motrin he had been taking was "not very effective." (*Id.* at 35.) Defendant Jackson noted that Plaintiff's condition was "unchanged from 3-30-12 visit" and ordered Plaintiff to continue on Motrin and return on May 4, 2012, for a follow-up appointment. (*Id.* at 36.)

On April 30, 2012, Plaintiff sent a kite requesting a follow-up on his knee problems. (*See id.* at 37.) The response to his kite request indicates that he was scheduled for an appointment on May 8, 2012. (*Id.*) This visit appears to have occurred on May 17, 2012, when Plaintiff met with Defendant Jackson. (*See id.* at 38-39.) Plaintiff informed Defendant Jackson that his knee pain had not subsided; instead, it was "now constant and worse at night," it alternated between dull and sharp, and it had increased to an eight on a ten-point scale. (*Id.* at 38.) Plaintiff reiterated that his Motrin regimen was not effective. (*Id.*) Defendant Jackson noted "[f]ull active and passive [range of motion]." (*Id.*) She also noted that Plaintiff was dissatisfied with the treatment he was receiving for his knee pain and that he was "visibly disturbed and walked out [of the] clinic." (*Id.*) She further noted that Plaintiff was "ambulating with no difficulty," that he was "able to remove his pants without difficulty," and that he was "not receptive" when he was informed that "there is no indication for his requested arthrocentesis." (*Id.* at 39.) Defendant Jackson was "unable to address if [Plaintiff] would like renewal of Motrin" because he "walked out." (*Id.* at 39.)

On May 25, 2012, Plaintiff fell down a set of stairs. He told a nurse that his right knee "locked up," which caused him to fall. (*See id.* at 40.) He told the nurse that he did not want Motrin or Tylenol because "the meds don't help." (*Id.*) Defendant Jackson was informed, and Plaintiff was sent back to his unit. (*Id.*)

On June 2, 2012, Plaintiff sent another kite requesting an appointment for "knee pain." He was scheduled for an appointment on or about June 11, 2012. (*Id.* at 41.) On June 11, 2012, Plaintiff was seen by a nurse at the prison clinic. (*Id.* at 42.) She noted that Plaintiff complained of pain of an eleven on a ten-point scale, that it hurt worse when he was lying down, and that his knee was tender, painful with movement, weak, and swollen, with limited range of motion and palpable distal pulses. (*Id.*) Plaintiff complained that he thought there was fluid on his knee. (*Id.*) The treatment plan following this appointment is unclear. (*See id.* at 42-43.)

On June 14, 2012, Plaintiff sent another kite related to his knee pain, and he was scheduled for another appointment on June 21, 2012. (*See id.* at 44.) Plaintiff was actually seen by Defendant Jackson on June 18, 2012, who noted that Plaintiff's complaints were consistent with his previous complaints in March, April, and May 2012. (*Id.* at 46.) She noted that Plaintiff's right knee had an active range of motion up to 60 degrees and active extension up to 25 degrees with full passive range of motion. She also noted that Plaintiff was "[a]mbulating with a very slight limp but [with] no difficulty." (*Id.*) Defendant Jackson also appears to have discussed the case with Dr. Jayawardena and indicated that she would "generate MRI for the knee as [Plaintiff] continues to [complaint of] knee pain." (*Id.*) That day, Defendant Jackson requested an "MRI of [Plaintiff's] right knee to [rule out] meniscal injury." (*Id.* at 49; docket no. 55-2 at 1.) The request appears to have been approved. (*See* docket no. 55-2 at 2.) The next day, Plaintiff sent a letter to Frank Konieczki, Administrative Assistant at the Ryan Correctional Facility, requesting assistance in getting a Step 2 Grievance Appeal form and telling Mr. Konieczki about his medical issues. (Docket no. 58 at 9-10.) That same day, Plaintiff submitted his Complaint in this matter; it was filed by the Court on June 22, 2012. (Docket no. 1.)

On June 24, 2012, Plaintiff again submitted a kite regarding his knee pain, and he was scheduled to see a nurse on June 27, 2012. (*See* docket no. 55-2 at 5.) Plaintiff saw the nurse on June 27, 2012, and he told her that he "kited because [he] noticed a bump on [his knee]." (*Id.* at 6.) The nurse noted that Plaintiff's objective symptoms were consistent with his previous visits, but she also added that he had "slight edema in right knee and [a] small raised protrusion." (*Id.*) She applied heat to his knee, immobilized it with a bandage/splint, and told Plaintiff to call if his symptoms did not subside or if they got worse. (*Id.* at 7.)

Plaintiff had an MRI exam performed on his right knee on or about June 29, 2012. (*See id.* at 9-10.) The MRI indicated the following:

1. an "undersurface tear in the posterior horn of the medial meniscus;"
2. a "small ruptured popliteal cyst;"
3. "edema in the soleus and lateral head of the gastrocnemius muscles . . . that is probably related to muscle strain;"
4. a "ganglion cyst associated with the posterior cruciate ligament;"
5. "quadriceps and petallar tendinosis without full-thickness tear;"
6. "mild tricompartment osteoarthritis, with early medial compartment chondromalacia;"
7. some "old injuries of the anterior cruciate ligament and medial collateral ligament;" and
8. "prepatellar and superficial and deep intrapaterral bursitis."

(*Id.* at 9-10.) On July 3, 2012, after receiving the results of this exam, Defendant Jackson requested that Plaintiff be permitted to follow up with an orthopedics specialist. (*See id.* at 17.) On July 9, 2012, she received a response that the "medical necessity for orthopedic referral [was] not demonstrated," and that the "MRI does not demonstrate pathology that will be significantly improved with surgery." (*Id.* at 21.) She was told to determine if Plaintiff's knee was "locking," or if he was unable to fully straighten it, and if so, she should resubmit her request. (*Id.* at 21-22.) Otherwise, Defendant Jackson was told to "continue conservative management including progressive knee strengthening exercises." (*Id.* at 22.)

On July 10, 2012, Plaintiff met with Defendant Jayawardena because Defendant Jackson was "on another assignment" that month. (*Id.* at 23.) Defendant Jayawardena discussed the results of Plaintiff's MRI with him and explained that "joints with multiple pathologies, especially osteopathic arthritis, do not very well respond to surgical treatment" and that "people less than 40 years of age would respond to operative treatment." (*Id.* at 24 (punctuation added).) She also added that because Plaintiff "has not responded to conservative management," which she indicated was "appropriate therapy for acute knee injury," she would "resubmit the request for ortho[pedic] consultation so that [an] orthopedic surgeon can review [Plaintiff's] MRI and advise [on] the best nonoperative course beneficial to [Plaintiff]." (*Id.* at 25.) Defendant Jayawardena resubmitted the consultation request that day. (*See id.* at 26.) On July 12, 2012, she received a response indicating that "most of [Plaintiff's] 'pathologies' . . . do not require any treatment[,] . . . includ[ing the] undersurface tear [of his] medial meniscus, popliteal cyst, soleus and gastrocnemius edema, [and] ganglion cyst." (*Id.* at 30.) The response noted that Plaintiff's bursitis and tendonitis "should be managed with rest and short-term NSAIDs[, and] stretching of [his] quads, hamstrings, [and] calf muscles." (*Id.*) Defendant Jayardena was told that "[o]nce [Plaintiff's] pain is decreased, [he] can be given knee strengthening exercises." (*Id.*)

On July 17, 2012, Plaintiff met with Defendant Jayawardena, who informed him that her request for an orthopedic consult was denied, but she recommended an alternative treatment plan, including physical therapy. (*Id.* at 34.) She asked Plaintiff if he would like her to request approval to attend physical therapy, and he consented. (*Id.*) Defendant Jayawardena requested that Plaintiff be approved for a consultation with a physical therapist, and on July 18, 2012, he was approved for "1 visit only . . . to provide instructions for a home exercise program for knee strengthening." (*Id.* at 38-39.) Plaintiff was told on July 24, 2012, that his request was approved and that he would also be "evaluated for any other suitable equipment[,] like braces," during his appointment. (*Id.* at 40.)

It appears that Plaintiff was transferred from the Ryan Correctional Facility to the Carson City Correctional Facility on or about July 26, 2012. (*See id.* at 42.) Plaintiff was setup for an appointment with his new medical provider on or about August 1, 2012, to discuss his knee pain. (*See id.*) This appointment occurred on August 3, 2012, wherein Plaintiff met a nurse practitioner and recounted the history of his knee problems. (*See id.* at 43.) The NP noted that Plaintiff was setup to go to a physical-therapy appointment and, in the meantime, he was to continue using heat, stretching, and using Tylenol for pain. (*Id.* at 44-45.)

Plaintiff had his physical-therapy evaluation on August 6, 2012. (*See id.* at 49-50.) The therapist noted that Plaintiff was ambulating without a device but with a compensated gait pattern. (*Id.* at 49.) She noted that his knee was not "locking," and that although he "stated he was unable to straighten his right knee," "when testing [his] ankle, [she was] able to passively ext[end his] knee." (*Id.*) She further noted that Plaintiff asked her to drain fluid from his knee and stated that he wanted meniscus surgery. She responded by telling Plaintiff that "people without visible effusion do not have their knees drained," and that he did not need surgery because "he does not demo locking out of the knee." (*Id.* at 49-50.) The therapist opined that Plaintiff's rehab potential was "good" and that he would be "independent with [a] progressive home exercise program within 1 week." (*Id.* at 50.) Plaintiff returned from his appointment, and a prison nurse noted that he was "walking on the toes of his right foot," which Plaintiff indicated was because his knee hurt. (Docket no. 55-3 at 1.) The nurse "showed him that [according to his exercise plan] he is to be walking on the heel like he would normally walk." (*Id.*)

Plaintiff submitted another kite eight days later, on August 14, 2012, related to his knee pain. He was then scheduled for an appointment on August 21, 2012. (*Id.* at 4.) Plaintiff had an appointment with another prison nurse on August 16, 2012, at which time she noted that Plaintiff's symptoms remained largely the same as they were in his prior visits. (*Id.* at 7-8.) She did note that his knee was warm to the touch and swollen. (*Id.* at 7.) Plaintiff was ordered to wrap with ace bandages, ice his knee three times a day, take Tylenol for the pain, and avoid work and sports. (*Id.* at 8.)

6

Plaintiff sent another kite on August 26, 2012, at which time he was told that he had a follow-up appointment scheduled for August 30, 2012. (*Id.* at 12.) Plaintiff met with a prison doctor on August 30, 2012, who noted Plaintiff's continuing pain and complaints of his knee "locking up." (*Id.* at 13.) The doctor noted that he would follow up to see the MRI and X-ray results as well as Plaintiff's physical-therapy evaluation. (*Id.* at 14.)

Plaintiff returned to the clinic on September 10, 2012, and noted that his pain was becoming worse with the cooler weather. (*Id.* at 16.) He stated that he was "[u]sing Tylenol and heat with no relief" and that his knee had been giving out more since he started his physical-therapy exercises. (*Id.*) The nurse that examined Plaintiff noted that he had a "4cm faint pink area" on his knee and opined that his knee may be deteriorating because he was wearing the ace bandages every day instead of strengthening his knee. (*Id.* at 17-18.) Plaintiff was ordered to continue with his current treatment plan. (*Id.* at 18.) He was asked to return his ace bandages and his crutches (if he still had them) to the clinic. (*Id.* at 20.)

Plaintiff sent another kite related to his knee pain on September 24, 2012, and he was scheduled for an appointment on October 1, 2012. (*Id.* at 25.) In a clinical note dated September 27, 2012, the prison doctor noted that physical therapy "was authorized[, but] there's still an unhappy knee." (*Id.* at 28.) Plaintiff filed his Amended Complaint on September 28, 2012. (Docket no. 16.)

Plaintiff went to his scheduled appointment on October 1, 2012, where he told the attending PA that his knee still hurt. The PA noted that his gait was slow and he limped on his right leg. Plaintiff's knee was still tender, warm to the touch, and swollen. (Docket no. 55-3 at 30.) Plaintiff was told again to "limit activity that causes increased stress or strain to [his] right knee," use Tylenol for his pain, elevate his knee, and follow up at the clinic in one month. (*Id.* at 31.)

Plaintiff returned to the clinic on October 22, 2012, where he told his attending nurse practitioner that he still had knee pain. She noted that he had stopped his physical-therapy exercises "about two weeks ago" because they caused pain and that he was still wearing an ACE wrap. (*Id.* at 35.) She instructed Plaintiff to "continue to do the exercises taught by physical therapy" and told him that he should stop wearing the ACE wrap because it would "cause muscle weakness and [the] exercises are to increase the strength of the muscles in his knee." (*Id.*) She also ordered a new x-ray of his knee, which was conducted that day. (*See id.* at 37, 38.) The x-ray indicated that there was "soft tissue swelling" and "early arthritic changes," which was consistent with his x-ray from April 3, 2012. (*Id.* at 40.) Plaintiff returned his ACE wrap on November 1, 2012. (*Id.* at 51.)

7

On December 19, 2012, Plaintiff had an appointment with an orthopedic specialist, Dr. Thomas Haverbush. (Docket no. 58 at 17-21.) Dr. Haverbush performed a complete examination of Plaintiff's knee and reviewed his x-rays and MRI. (*See id.*) He opined that Plaintiff required a medial meniscectomy, and requested "approval to schedule [right] knee arthroscopic surgery" because he "d[id] not feel [Plaintiff] c[ould] improve without the procedure." (*Id.* at 21.)

It appears, however, that Dr. Haverbush's request was not approved, because on May 7, 2013, Plaintiff met with a prison psychologist regarding depression "that he believes . . . is due to chronic pain in his knee." (*Id.* at 64.) Plaintiff told the psychologist that he had "trouble sleeping due to the pain." The psychologist noted that Plaintiff did not want any medications; he just had "no close friends in prison that he fe[lt] comfortable talking to about this." (*Id.*) The psychologist further noted that Plaintiff was "pleasant and calm, very respectful." (*Id.*) The psychologist then recommended that Plaintiff look into self-hypnosis by getting some books from the library. (*Id.*)

On June 3, 2013, Plaintiff sent a letter to Defendant Corizon indicating that he was sent to physical therapy in February 2013 and that his condition has "gotten worse" in the "nearly fifteen months" since his injury. (*Id.* at 44-45.) Plaintiff further indicated that he had met with a prison psychologist regarding depression related to his pain, and she told him to go to the library to "read books about self-hypnosis to alleviate [his] pain." (*Id.* at 44.) On June 18, 2013, Plaintiff sent a letter to the prison librarian requesting help in finding self-hypnotism books. (*Id.* at 47.)

On September 10, 2013, Plaintiff requested health-care services for an injury that he sustained when he hit his head falling out of his bunk. (*Id.* at 49.) Plaintiff claimed that his right knee had locked up on him when he tried to climb out of bed. He further indicated that his knee condition was "getting <u>worse</u>." (*Id.* at 49 (emphasis in original).) Plaintiff was given a "bottom bunk" assignment on September 26, 2013. (*Id.* at 50.)

(Docket no. 65 at 2-12 (footnotes omitted).)

### B.     Procedural History

In August 2013 and October 2013, before Defendants filed their initial Motion for Summary Judgment, Plaintiff filed three a Motions to Compel (docket nos. 47, 59, and 62). On November 11, 2013, the undersigned recommended that Defendants' Motion for Summary Judgment be granted and that Plaintiff's Motions to Compel be denied as moot. (Docket no. 65 at 22-23.) The

recommendation was adopted in part, dismissing Defendants Jackson and Jayawardena but denying Defendant's Motion with regard to Defendant Corizon; additionally, the Plaintiff's outstanding Motions to Compel were referred back to the undersigned for full consideration based on the possibility that, if granted, the Motions may lend support to Plaintiff's claim against Defendant Corizon. (Docket no. 73 at 9.)

On May 5, 2014, the Court granted in part and denied in part Plaintiff's Motions to Compel, ordering Defendant Corizon to answer Plaintiff's Interrogatory No. 5. (Docket no. 77.) Interrogatory No. 5 asked Defendant to:

> [s]tate whether any state has withdrawn from, or refused to renew, its contract with Corzon Health, Inc. To provide health care for its prisoners, whether under the former name or current name of your corporation, based on the state's allegations that Corizon Health, Inc. failed to provide adequate care to its prisoners.

(Docket no. 62 at 4.) Pursuant to the Court's order, Defendant Corizon responded to this interrogatory on May 22, 2014, stating:

> Corizon Health, Inc. ("Corizon") cannot speculate as to any reasons not disclosed to it by a state, for a state's withdrawing from or failing to renew a contract. Subject to this reservation, Corizon has conducted a diligent search of its records relating to contracts between Corizon and the states with which it has done business over the past ten years. To the best of its knowledge, belief and information, no state has informed Corizon that it was withdrawing from or refusing to renew a contract with Corizon or its predecessor, Prison Healthcare Services, Inc., based on allegations that Corizon provided inadequate care to prisoners.

(Docket no. 79-1 at 2.) Defendant Corizon then filed its instant Motions. (Docket nos. 80 and 81.)

### C. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the

9

district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587,

drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

**D. Analysis**

**1. Plaintiff's Failure to Exhaust Administrative Remedies**

Defendant Corizon argues that Plaintiff failed to exhaust his Step III (or Step II) grievances before filing his initial or Amended Complaint, and therefore, Plaintiff's claim should be dismissed. (Docket no. 81-1 at 27-28.) This same argument was presented to this Court in Defendants' initial Motion for Summary Judgment. (Docket no. 52.) The undersigned found that Plaintiff did attempt to comply with the Michigan Department of Correction's grievance policy and recommended that Defendants' Motion be denied with regard to that issue. (Docket no. 65 at 13-16.) Defendant Corizon's argument has not changed; therefore, the undersigned again recommends denying Defendant's Motion with regard to this issue.

**2. Plaintiff's Constitutional Violation Claims against Defendant Corizon**

Regardless of the procedural issues, though, Plaintiff's claims fail as a matter of substance. As noted in the November 11, 2013, Report and Recommendation, corporations cannot be held liable under § 1983 on a respondeat-superior or vicarious-liability basis. (Docket no. 65 at 20) Additionally, to hold a defendant corporation liable, a plaintiff must establish that (1) his or her Eighth Amendment rights were violated by a policy, custom, or practice implemented by the defendant, and (2) the plaintiff's alleged harm was caused by that policy, custom, or practice. (*Id.*)

Plaintiff claims that Defendant Corizon denied him proper treatment based on financial considerations. (Docket no. 56 at 15.) But the undersigned previously found that Plaintiff had failed to provide any evidence supporting this claim or any evidence showing that Defendant Corizon's

11

decisions were based on a policy, custom, or practice. (Docket no. 65 at 21.) Plaintiff objected, arguing that if he were given a full opportunity to conduct and complete discovery through his Motions to Compel, he would be able to support his claims. (Docket no. 66 at 2-3.) The Court agreed with Plaintiff's argument, and the undersigned partially granted Plaintiff's Motions to Compel, ordering Defendant to respond to Plaintiff's Interrogatory No. 5.

Plaintiff's Motions to Compel having been decided and his Interrogatory having been answered, Plaintiff still has provided no evidence to support his claim that Defendant Corizon based its treatment decisions on an unconstitutional policy, custom, or practice. Thus, the Courts prior analysis remains unchanged; Plaintiff is unable to establish any factual basis for his allegations other than his own speculation. Moreover, the one case Plaintiff cites in support of his position, *Caruthers v. Correctional Medical Services, Inc.*, No. 1:10–cv–274, 2011 WL 6402278 (W.D.Mich. Dec.21, 2011), supports Defendant's contention that their determination was not made based on financial considerations. Therefore, the undersigned recommends granting Defendant Corizon's Renewed Motion for Summary Judgment.

### E.     Conclusion

For the reasons that stated above, the undersigned recommends GRANTING Defendant Corizon's Amended Renewed Motion for Summary Judgment [81]. Thus, the undersigned also recommends DENYING Defendant Corizon's Renewed Motion for Summary Judgment [80] as moot. Therefore, the undersigned recommends dismissing this matter in its entirety.

### III.    Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28

U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: December 4, 2014                s/ Mona K. Majzoub
                                       MONA K. MAJZOUB
                                       UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Ardra Young and Counsel of Record on this date.

Dated: December 4, 2014                s/ Lisa C. Bartlett
                                       Case Manager